VICKIE ROUSE, Individually and as Guardian ad Litem for TRAVIS SENTEL ROUSE v. PITT COUNTY MEMORIAL HOSPITAL, INCORPORATED, LYNN G. BORCHERT, ROBERT G. BRAME, JARLATH MacKENNA, MICHAEL R. WATKINS, THOMAS J. BYRNE and JOEL B. McCUAIG

No. 505PA94

(Filed 10 May 1996)

## 1. Physicians, Surgeons, and Other Health Care Professionals § 96 (NCI4th)— negligence by resident physicians—negligent supervision by attending physicians—genuine issue of fact

In an action to recover for the negligent delivery of the minor plaintiff, plaintiff's forecast of evidence was sufficient to establish a genuine issue of material fact on the issue of defendant attending physicians' negligent supervision of the obstetrics residents who provided medical care for the mother and the minor plaintiff where it tended to show that defendant McKenna had the daytime responsibility for the on-call supervision of the obstetrics residents and defendant Borchert assumed this responsibility after 5:00 p.m.; nonreassuring patterns of fetal heart rate were first documented by a nurse at 1:45 p.m. and thereafter continued to be present; the minor plaintiff was delivered by emergency cesarean section at 8:53 p.m. and suffered serious brain damage;

ROUSE v. PITT COUNTY MEMORIAL HOSPITAL

[343 N.C. 186 (1996)]

the obstetrics residents were negligent in failing to recognize the mother's abnormal labor pattern and the fetal heart rate abnormalities, failing properly to determine the status of the fetus during labor, and failing to intervene with a cesarian delivery at an appropriate time; neither defendant made rounds at the hospital with the residents or otherwise checked with the residents on the conditions of the patients being cared for by the residents; and defendant Borchert was at home and did not see the mother until a resident called him at 8:00 p.m. to come to the hospital.

**Am Jur 2d, Physicians, Surgeons, and Other Healers § 286.**

**Liability of one physician or surgeon for malpractice of another. 85 ALR2d 889.**

2. **Physicians, Surgeons, and Other Health Care Professionals § 96 (NCI4th)— negligence by resident physicians—vicarious liability of attending physicians—borrowed servant rule—genuine issue of fact**

Although resident physicians were employees of a hospital, the hospital retained the authority to hire, pay, discipline and terminate resident physicians and the ultimate authority to grant hospital privileges to resident physicians to perform certain tasks, and defendant attending physicians were employed by the ECU School of Medicine, plaintiff's forecast of evidence was sufficient to establish a genuine issue of material fact as to defendant attending physicians' vicarious liability under the "borrowed servant" doctrine for the alleged negligence of obstetric resident physicians in the delivery of the minor plaintiff where it tended to show that defendant attending physicians had the responsibility for the supervision of the resident physicians who provided medical care during the mother's labor and the delivery and birth of the minor plaintiff; the hospital delegated the right to control the resident physicians' *manner* of medical services exclusively to the ECU School of Medicine faculty attending physicians who had been granted clinical privileges at the hospital; and the hospital did not employ an obstetrician.

**Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 286, 289.**

**Liability of one physician or surgeon for malpractice of another. 85 ALR2d 889.**

Justice PARKER did not participate in the consideration or decision of this case.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 116 N.C. App. 241, 447 S.E.2d 505 (1994), reversing judgments entered by Brown (Frank R.), J., on 29 May 1990 and 1 June 1990 in Superior Court, Pitt County. Heard in the Supreme Court 9 October 1995.

*Law Offices of Grover C. McCain, Jr., by Ada F. Most and Grover C. McCain, Jr., for plaintiff-appellee.*

*Walker, Barwick, Clark & Allen, L.L.P., by Robert D. Walker, Jr., for defendant-appellant Borchert.*

*Yates, McLamb & Weyher, L.L.P., by Joseph W. Yates, III, Suzanne S. Lever, and Bruce W. Berger, for defendant-appellant MacKenna.*

ORR, Justice.

This appeal arises from a medical malpractice action brought by Vickie Rouse ("plaintiff Rouse"), individually and as guardian *ad litem* for her minor son, Travis Sentel Rouse ("the minor plaintiff"), on 30 January 1989 against defendants Pitt County Memorial Hospital Inc. ("the Hospital"), Dr. Jarlath MacKenna, Dr. Lynn Borchert, Dr. Robert Brame, Dr. Michael Watkins, Dr. Thomas Byrne, and Dr. Joel McCuaig. Defendants MacKenna, Borchert, and Brame were on-call attending physicians in the Department of Obstetrics ("OB") and Gynecology at the Hospital during plaintiff's labor and delivery. Defendants Watkins, Byrne, and McCuaig were resident OB physicians under the supervision of Dr. MacKenna and Dr. Borchert during plaintiff's labor and delivery.

Plaintiffs seek money damages for injuries allegedly caused by defendants during plaintiff Rouse's labor and the delivery and birth of the minor plaintiff at the Hospital on 12 August 1982. In the complaint, plaintiff Rouse, in her individual capacity, alleged that defendants MacKenna, Borchert, and Watkins fraudulently concealed the information that there were intraoperative complications during plaintiff Rouse's caesarean section and that she sustained intraoperative lacerations. Further, plaintiff Rouse, as guardian *ad litem*, alleged that all named defendants were negligent in their provision of

ROUSE v. PITT COUNTY MEMORIAL HOSPITAL

[343 N.C. 186 (1996)]

medical care and treatment during plaintiff Rouse's labor and the delivery and birth of the minor plaintiff and that defendants MacKenna and Borchert, as on-call attending physicians, were negligent in their supervision of the resident physicians.

Defendants MacKenna and Borchert answered, denying any negligence; subsequently, after discovery, they filed separate motions for summary judgment, which the trial court allowed. Plaintiff Rouse, as guardian *ad litem*, appealed the entry of both orders to the Court of Appeals, which held, on 5 November 1991, in an unpublished opinion, that plaintiff's appeal was interlocutory and premature and dismissed the appeal. *Rouse v. Pitt Co. Mem. Hosp.*, 104 N.C. App. 554, 410 S.E.2d 241 (1991), *disc. rev. denied*, 330 N.C. 852, 413 S.E.2d 553 (1992).

On 30 April 1992, plaintiff Rouse, as guardian *ad litem*, filed a notice of voluntary dismissal without prejudice in the action against defendant Dr. Brame. On 22 May 1992, plaintiff Rouse, as guardian *ad litem*, filed a Rule 54(b) motion for revision of orders allowing defendants MacKenna's and Borchert's motions for summary judgment in accordance with the guidelines set forth in this Court's opinion in *Mozingo v. Pitt Co. Mem. Hosp.*, 331 N.C. 182, 415 S.E.2d 341 (1992), in which this Court affirmed the Court of Appeals' reversal of summary judgment for the defendant Mozingo, who was the on-call attending physician and obstetrician in an obstetrical medical negligence action. On 7 August 1992, plaintiff Rouse's motion was heard before Judge Brown, who, by an order filed 9 November 1992, denied plaintiff's Rule 54(b) motion to revise the orders granting summary judgment for defendants MacKenna and Borchert.

On 31 December 1992, plaintiff Rouse, in her individual capacity, filed a notice of partial voluntary dismissal of her individual action for fraudulent concealment against defendant Watkins, with prejudice, and against defendants Borchert and MacKenna, without prejudice. Also on 31 December 1992, plaintiff Rouse, as guardian *ad litem*, filed notice of voluntary dismissal with prejudice as to the minor plaintiff's negligence claims against defendants Watkins, Byrne, and McCuaig. A settlement was reached between plaintiff Rouse, as guardian *ad litem*, and defendant Hospital, and on 31 December 1992, Judge William C. Griffin, Jr. entered a consent order approving the settlement. Plaintiff Rouse, as guardian *ad litem*, filed notice of voluntary dismissal with prejudice as to the minor plaintiff's claims against defendant Hospital.

ROUSE v. PITT COUNTY MEMORIAL HOSPITAL

[343 N.C. 186 (1996)]

On 8 January 1993, plaintiff Rouse, as guardian *ad litem*, filed notice of appeal to the Court of Appeals from the orders for summary judgment and from the order denying plaintiff's Rule 54(b) motion to revise the orders. On 6 September 1993, the Court of Appeals reversed the trial court's grant of summary judgment in favor of defendants MacKenna and Borchert on the issue of negligent supervision and reversed the trial court's grant of summary judgment in favor of defendants MacKenna and Borchert on the issue of vicarious liability under the "borrowed servant" doctrine.

On 9 February 1995, this Court allowed defendants MacKenna's and Borchert's petitions for discretionary review.

With respect to plaintiff Rouse's claims, as guardian *ad litem*, against Dr. MacKenna and Dr. Borchert for negligent supervision and vicarious liability based upon the "borrowed servant doctrine," the forecast of evidence before the trial court, found in allegations in the complaint, the depositions, the stipulations of counsel, and the affidavits in the record on appeal, tends to show that on 12 August 1982 at approximately 8:30 a.m., plaintiff Rouse, who was in labor, was admitted to the Hospital to the service of defendant MacKenna. While defendant Dr. Brame was the on-call attending physician from approximately 8:00 a.m. until 12:00 p.m., it was customary for indigent OB patients such as plaintiff Rouse to be admitted to the service of defendant MacKenna. From approximately 12:00 noon until approximately 5:00 p.m. that evening, as on-call attending physician, defendant MacKenna assumed the responsibility for the on-call supervision of defendants Watkins, the chief OB resident, and Thomas Byrne and McCuaig, the OB residents at the Hospital, who were providing medical care and treatment to Ms. Rouse during her labor and delivery. At 1:45 p.m., nonreassuring patterns of fetal heart rate began to appear and were first documented by a nurse on duty; however, defendant MacKenna testified that he was not consulted by any of the defendant OB residents regarding Ms. Rouse's labor progression.

At approximately 5:00 p.m., defendant Borchert assumed the responsibility for the on-call supervision of the OB residents who were providing medical care for the plaintiffs. While defendant Borchert was the on-call attending physician, the nonreassuring patterns of fetal heart rate continued to be present; however, defendant Borchert was at home and did not see plaintiff Rouse during the second stage of labor until defendant Watkins called defendant Borchert at approximately 8:00 p.m. to come to the Hospital.

The minor plaintiff was delivered at 8:53 p.m. by emergency cesarean section but did not have spontaneous respirations. He was resuscitated with oxygen and bag and mask, intubated, and then transferred to the Neonatal Intensive Care Unit. Subsequently, the minor plaintiff developed significant seizure problems, was placed on several medications, and was diagnosed as suffering from severe cerebral anoxia. Today, he is profoundly mentally retarded and suffers from cerebral palsy, severe spastic quadraparesis, and seizures.

## I.

[1] The first issue before this Court is whether the Court of Appeals erred in reversing the trial court's grant of summary judgment for defendants MacKenna and Borchert on the issue of negligent supervision. "Summary judgment is a drastic measure," and is rarely appropriate in negligence cases. *See Mozingo*, 331 N.C. at 187, 415 S.E.2d at 344. On a motion for summary judgment, the moving party has the burden of establishing that no triable issue of fact exists and that he is entitled to judgment as a matter of law. *Id.* at 72, 269 S.E.2d at 140. Once the moving party meets this burden, the burden is then on the opposing party to show that a genuine issue of material fact exists. *Id.* at 73, 269 S.E.2d at 140. If the opponent fails to forecast such evidence, then the trial court's entry of summary judgment is proper. *See Rorrer v. Cooke*, 313 N.C. 338, 354-55, 329 S.E.2d 355, 365-66 (1985).

In *Mozingo*, this Court stated that

[m]edical professionals may be held accountable when they undertake to care for a patient and their actions do not meet the standard of care for such actions as established by expert testimony. Thus, in the increasingly complex modern delivery of health care, a physician who undertakes to provide on-call supervision of residents actually treating a patient may be held accountable to that patient, if the physician negligently supervises those residents and such negligent supervision proximately causes the patient's injuries.

*Mozingo*, 331 N.C. at 189, 415 S.E.2d at 345. " 'To recover damages for actionable negligence, a plaintiff must establish (1) a legal duty, (2) a breach thereof, and (3) injury proximately caused by such breach.' " *Mozingo*, 331 N.C. at 187, 415 S.E.2d at 344 (quoting *Waltz v. Wake Co. Bd. of Educ.*, 104 N.C. App. 302, 304-05, 409 S.E.2d 106, 107 (1991), *disc. rev. denied*, 330 N.C. 618, 412 S.E.2d 96 (1992)). To resolve this issue, we must first decide whether "there was a forecast of evidence tending to show that the defendant, in his capacity as an

on-call supervising physician, owed a duty of reasonable care to the plaintiffs." *Mozingo*, 331 N.C. at 184, 415 S.E.2d at 342.

In the present case, it is uncontested that the defendants, as on-call attending physicians, had a duty to supervise and train the resident physicians. Therefore, as the Court of Appeals correctly concluded, following *Mozingo*, we hold that the defendants owed a duty to plaintiffs to exercise reasonable care in supervising the residents.

The gravamen of the minor plaintiff's claim is that the defendants breached the standard of reasonable care by negligently supervising the obstetrics residents who cared for him and his mother during his birth and that this negligent supervision proximately caused the minor plaintiff's injuries. Thus, the question becomes whether there is a genuine issue of material fact that defendants in their role as on-call attending physicians breached their duty of reasonable care in supervising the resident physicians.

The *Mozingo* case is controlling on this issue. According to the facts in *Mozingo*, when defendant Dr. Kazior began his on-call duty for the OB resident physicians who were caring for patients, he remained at his home available to take telephone calls from the residents. Shortly before 9:45 p.m., Dr. Kazior received a telephone call from a resident physician informing him that she had encountered a problem with the delivery of baby Mozingo. The baby was suffering shoulder dystocia, a condition in which a baby's shoulder becomes wedged in the mother's pelvic cavity during delivery. Dr. Kazior stated that he would be there immediately and left his home for the hospital, which was located approximately two miles away. When Dr. Kazior arrived at the hospital, the delivery of baby Mozingo had been completed.

The plaintiff child, through his guardian *ad litem*, brought an action against defendant Dr. Kazior, as the on-call supervising physician when the plaintiff child was born, alleging negligent supervision of the OB resident physicians. The plaintiffs alleged that Dr. Kazior "failed to make reasonable effort to monitor and oversee the treatment administered by the defendant, Melinda Warren, [a second-year OB resident physician], and the agents of the Defendant, Hospital." *Id.* at 185, 415 S.E.2d at 343.

The trial court granted summary judgment in the defendant's favor. On appeal, this Court affirmed the decision of the Court of Appeals to reverse the trial court and concluded that the evidence forecast by the plaintiffs established a genuine issue of material fact

ROUSE v. PITT COUNTY MEMORIAL HOSPITAL

[343 N.C. 186 (1996)]

as to whether the defendant Dr. Kazior breached the applicable standard of care and thereby proximately caused the plaintiffs' injuries.

In considering whether there was a genuine issue of material fact as to whether the defendant breached his duty of reasonable care, we noted that plaintiffs' expert's sworn affidavit stated that Dr. Kazior "should have called in at the beginning of his on-call coverage and periodically thereafter to check on the status of the patients" being treated and managed by the residents. *Id.* at 191, 415 S.E.2d at 346. We also noted that the affidavits submitted on behalf of the defendant stated that an "on-call physician may take calls at home 'unless a problem is specifically anticipated.' " *Id.* This Court then concluded that, according to defendant's own experts, "simply remaining at home and available to take telephone calls is not always an acceptable standard of care for supervision of residents." *Id.* We then held that defendant Dr. Kazior's failure to call in and periodically check on the status of the patients being treated by the residents established "a genuine issue of material fact as to whether the defendant doctor breached the applicable standard of care and thereby proximately caused the plaintiffs' injuries." *Id.*

Similarly, in the case at bar, defendant Dr. Borchert filed the affidavits of Dr. Ernest Brown, Jr., and Dr. Samuel Wheatley in support of his motion for summary judgment. Both affiants stated that "the care and treatment rendered to the plaintiff . . . was appropriate and in all respects in accordance with the standards of practice for physicians engaged in the practice of obstetrics who possess training and experience similar to the defendant who were engaged in such practice in the defendant's community."

Defendant MacKenna presented three affidavits, including his own, to support his motion for summary judgment. Two of the affidavits were given by Dr. Watson Bowes, Jr., and Dr. Joseph Ernest, III, faculty professors from the University of North Carolina School of Medicine and Bowman Gray School of Medicine, respectively, who are responsible for the supervision and training of OB resident physicians. These affiants stated that the protocol of their respective medical communities "did not require that an On Call Attending [P]hysician personally examine each obstetrical patient who was admitted while he was on call, nor did the applicable procedures require that he review the medical chart of such patients." Further, the affiants stated that the on-call attending physician "was permitted to afford coverage during the hours of his assignment by being immediately

accessible by telephone or pager" or "by either being present in the hospital or, unless a problem was present or specifically anticipated, by being present at his residence or other specified place" so as to be "immediately available" if his assistance was requested by a nurse or resident in obstetrics.

The plaintiff, as guardian *ad litem*, responded with the sworn affidavits of Dr. J. Patrick Lavery and Dr. Harold Schulman, who are both Board-certified obstetricians and specialists in maternal and fetal medicine. Both affiants stated that, in their opinion,

> it was the obstetrical standard of care for fully trained obstetricians, such as Dr. MacKenna and Dr. Borchert, to fully supervise and be responsible for the acts of residents working under their exclusive control and supervision. It is the duty of a fully trained attending physician (who is supervising resident physicians) to know the competency level of the training physicians that they supervise. This duty to know the competency level of a training resident working under the supervision of an attending is necessary and required in order to provide safe and adequate patient care. It is my opinion, to a reasonable degree of medical certainty, that the labor and delivery records of Vickie Rouse demonstrate that the resident physicians caring for her were not able to give, and did not give, obstetrical care that complies with appropriate standards for obstetrical practice. Since the attending physician noted on the hospital chart of Vickie Rouse was Dr. Jarlath MacKenna, and since Dr. MacKenna shared an on-call schedule with other attending physicians, the appropriate standard of care to apply for Vickie Rouse's obstetrical care is that of a fully trained attending obstetrician. Resident physicians, who manage the obstetrical care in the place of the attending physician caring for the patient, are under duty to bring to the patient the level and standard of care of an attending physician. They are working under the supervision of, and at the pleasure of, the attending physician who is responsible for the medical care delivered to the patient.

Further, they stated that

> Dr. MacKenna and Dr. Borchert . . . and the resident physicians who cared for [Ms. Rouse] at the direction and under the control of Dr. MacKenna and Dr. Borchert, deviated from the appropriate standards of practice in the following respects:
>
> (a) failure to recognize the abnormal labor pattern of Vickie Rouse and the fetal heart rate abnormalities;

ROUSE v. PITT COUNTY MEMORIAL HOSPITAL

[343 N.C. 186 (1996)]

(b) failure to determine the status of the fetus during labor by a scalp p.H. sample, when non-reassuring fetal heart tones continued;

(c) failure to monitor the fetal heart rate from around 8:15 p.m. when the scalp electrodes were removed until 8:53 p.m. when Travis Sentel Rouse was born;

(d) failure to intervene with a Cesarean delivery at an appropriate time[.]

Finally, the affiants stated that, in their opinion,

the appropriate standard of care in presence of the . . . documented fetal heart tones was for the attending physician, or the resident physician acting in the place of and under the control of the attending physician, to either assure himself of fetal well being by means of scalp pH sample or otherwise, or do an earlier Cesarean section than was done. . . . [T]he appropriate standard of care was to not allow Vickie Rouse to remain in second stage of labor for 4 hours in the presence of the continuing fetal heart-tone abnormalities.

. . . Dr. MacKenna and Dr. Borchert failed to adequately supervise their assistants, the resident physicians, who were managing the obstetrical care of their patient.

In addition, Dr. Robert Brame, Chairman of the Department of Obstetrics and Gynecology at the Hospital in August of 1982, testified by deposition regarding his expectations of an on-call attending physician. He explained his expectations by testifying to what he normally does as an on-call attending physician. He testified as follows:

I sort of patrol the area when I'm on call, which means I go in, and I—a common procedure this Thursday will be for me to go back and go over with the residents back there everybody who is on the board.

I may or may not go in the rooms and look at the monitor tracings, look at patients, say hello. If it's a patient who's having no problem of any sort and I've been told that and I'm comfortable with that assessment, I may not go into the room and see the patient physically.

When asked whether Dr. Brame would have expected to be informed if there was an abnormal labor, he responded, "I would expect to learn that by my patrolling in and out." Dr. Brame also testified that before leaving the patients to the nighttime on-call attending physician, he would expect a daytime on-call attending physician to have

assured himself that "the place was in proper order, that the patients were receiving proper care, and that there were no major problems that needed his attention. . . . [T]he attending should have known what was going on in the house, who was having a problem, what the anticipated problems might have been during the evening and night-time." He also testified that he expected that the attending physician, before leaving the hospital, would have walked through the floor and assured himself that there were no ongoing problems that did not require his staying and managing the situation. Finally, the Hospital's rules and regulations state in paragraph 6 that "the attending practi-tioner shall be responsible for reading all [clinical entries in the med-ical record]. All formal entries (such as history and physical exami-nation, operative reports, and discharge summaries) shall be countersigned (authenticated) by the attending practitioner."

Following the analysis in *Mozingo*, defendant MacKenna and oth-ers testified by deposition that the duty of an attending obstetrician is "[t]o be available for consultation to the residents." Dr. MacKenna tes-tified that, generally, he would "make morning rounds with the resi-dents," and "then the attending physician would sort of then be avail-able." However, there was no evidence presented that on the day in question, 12 August 1982, defendant Dr. MacKenna followed this practice.

Likewise, defendant Dr. Borchert testified during his deposition that

[m]y responsibility for caring for Ms. Rouse was to be available to respond to assist in her care in any way, to assist the resident in any way, if called upon, to provide care for Ms. Rouse and to respond when such request was made. Unless I had knowledge that something was irregular about her care or something pre-sented an increased risk so far as her care is concerned or some-thing was unusual about her care, I probably would not intervene unless asked to or notified by the resident.

While defendant Borchert maintains that he began his on-call duty, as he usually does, by checking with the resident physicians on the con-ditions of all the patients, the evidence presented established only his usual practice. Defendant Borchert specifically testified that he was unable to recall whether he went to the labor and delivery room to check on the status of the patients on the day that plaintiff delivered her child. Moreover, Dr. Watkins, the chief OB resident on duty on the date in question, testified by deposition that usually an attending

physician is "kept fairly well abreast of what was going on, himself[,] . . . without being asked."

Finally, plaintiffs' medical charts reveal no notations by either defendant or by any of the OB resident physicians on duty that indicate that they had toured the ward or examined Ms. Rouse. From the time of Ms. Rouse's arrival at the Hospital around 8:20 a.m. until 8:30 p.m. when the cesarean section was begun, her care was provided solely by resident physicians.

The evidence forecast by the plaintiff, as guardian *ad litem*, establishes a genuine issue of material fact as to whether the defendants breached the applicable standard of care and thereby proximately caused the plaintiff's injuries. Such issues are questions for the jury. *Mozingo*, 331 N.C. at 191, 415 S.E.2d at 346. Therefore, based on plaintiff's forecast of evidence, we conclude that the trial court erred in entering summary judgment for the defendants and affirm the decision of the Court of Appeals reversing the trial judge on this issue.

## II.

[2] Secondly, defendants contend that the Court of Appeals erred in reversing the trial court's granting of summary judgment in favor of defendants MacKenna and Borchert on the issue of their vicarious liability under the "borrowed servant" doctrine for the alleged negligence of the resident physicians.

This Court has previously examined the liability based on a theory of vicarious liability of medical professionals in supervisory capacities. "As a general rule, a physician who exercises due care is not liable for the negligence of nurses, attendants or interns who are not his employees." *Davis v. Wilson*, 265 N.C. 139, 146, 143 S.E.2d 107, 112 (1965). However, "[o]ne who borrows another's employee may be considered a temporary master liable in *respondeat superior* for the borrowed employee's negligent acts if [he] acquir[es] the same *right of control* over the employee as originally possessed by the lending employer." *Harris v. Miller*, 335 N.C. 379, 387, 438 S.E.2d 731, 735 (1994).

> Whether a servant furnished by one person to another becomes the employe (sic) of the person to whom he is loaned [depends on] whether he passes under the latter's right of control with regard not only to the work to be done *but also to the manner of performing it.* . . . A servant is the employe (sic) of the person who has the *right* of controlling the manner of his performance of the work, irrespective of whether he actually exercises that control or not.

ROUSE v. PITT COUNTY MEMORIAL HOSPITAL

[343 N.C. 186 (1996)]

*Id.* (emphasis in original) (alteration in original) (setting out the traditional test of liability under the borrowed servant doctrine) (quoting *Weaver v. Bennett*, 259 N.C. 16, 28, 129 S.E.2d 610, 618 (1963)).

"Residents are trained professionals and should be able to perform duties commensurate with their training without direct supervision." Stewart R. Reuter, M.D., J.D., *Professional Liability in Postgraduate Medical Education—Who is Liable for Resident Negligence?*, 15 J. Legal Med. 485, 505 (1994). "[R]esidents should be able to carry out an attending physician's orders in the physician's absence and the failure to do so in a reasonable manner should not cause the attending physician to become a borrowing employer." *Id.* "Absent evidence to the contrary, the presumption exists that the hospital intends to retain the right to control the activities of its house staff unless it specifically relinquishes such control." *Id.*; *see Harris*, 335 N.C. at 388, 438 S.E.2d at 736 ("Absent evidence to the contrary, the original employer is presumed to retain the right of control.").

Turning now to the question of whether the trial court erred in granting defendants MacKenna's and Borchert's motions for summary judgment on plaintiff's vicarious liability claims, our first task in analyzing the applicability of the "borrowed servant" doctrine is to determine whether this doctrine is implicated in the context of the on-call attending physician situation such as that under review. The threshold question is whether the resident physicians were general employees of the Hospital.

It is uncontested that the resident physicians involved in this case were employees of the Hospital. They were paid by the Hospital, spent all of their working hours under the direction of Hospital staff, and did not maintain a practice of their own. Moreover, upon the review of paragraph H of the by-laws of the medical staff of the Hospital, resident physicians are considered the "house staff" of the Hospital.

Having established that the Hospital is the resident physicians' general employer, the next matter to be determined is whether the Hospital's liability for the resident physicians' negligence shifted to defendants—that is, whether there is a sufficient forecast of evidence to prove that defendants, as the on-call attending physicians, had the right of control, *Harris*, 335 N.C. at 387, 438 S.E.2d at 735, over the resident physicians' manner of performance of their duties. Plaintiff Rouse, as guardian *ad litem*, argues that the forecast of evidence shows that although the house staff or resident physicians managed plaintiff Rouse's care, defendants MacKenna and Borchert had con-

trol over and the right to control the resident physicians' provision of her medical care and treatment because she was in fact the patient of the attending physicians, who were required to supervise and direct the resident physicians.

Plaintiff relies on the case of *Harris v. Miller*, the most recent North Carolina case discussing the "borrowed servant" doctrine. In *Harris*, this Court dealt with the liability of a surgeon for the negligence of a nurse anesthetist during an operation. *Harris* specifically addressed the issue of a surgeon's liability for operating personnel *working with him* throughout the course of an operation. *Id.* at 395, 438 S.E.2d at 740. This Court concluded that "[w]hether a surgeon may be held vicariously liable for the negligence of one assisting in the operation depends on whether, in the particular case, the surgeon had the right to control the manner in which the assistant performed." *Id.* Consequently, the Court of Appeals in the case at bar concluded that the issue of defendants' liability turned on whether the defendants "had the *right to control* the manner of the residents' performance of their duties." *Rouse*, 116 N.C. App. at 248, 447 S.E.2d at 509.

We find the circumstances in *Harris* wholly distinguishable from the instant case because the *Harris* decision was limited to deciding the proper application of the "borrowed servant" doctrine in the context of determining the liability of a surgeon for the negligence of operating room personnel over whom he had direct and actual control during the operation. This is not the situation in the case at bar.

Defendants argue that under circumstances such as when an attending physician is on-call, the "borrowed servant" doctrine is not even implicated unless the resident is in the presence of the attending physician and is acting under that attending physician's direct supervision and control. Defendant's argument is based on our decision in the case of *Davis*, 265 N.C. 139, 143 S.E.2d 107. However, we find defendants' reliance on *Davis* misplaced.

In *Davis*, the plaintiff sued the defendant physicians for the negligence of a medical technologist who had mislabeled a blood sample, which resulted in the death of a patient. Dr. Wilson, one of the defendants, was hired by Rex Hospital as chief of the laboratory department or chief pathologist and had supervisory responsibilities, under the control of the hospital director and the board of trustees, over the negligent medical technologist. This Court held that none of the defendants were vicariously liable for the technologist's negligence because of the evidence that showed that the defendants and the medical technologist were employees of and paid by the hospital; that

none of the "defendants, or any one of them, knew that Mrs. Davis was in Rex Hospital for surgery or that blood for transfusion had been requested for her and furnished by the laboratory department of the hospital"; and that "[the medical technologist] was not an agent or employee or servant of the three defendant doctors, or any one of them." *Id.* at 148, 143 S.E.2d at 113.

Unlike the case at bar, *Davis* turned on the fact that the defendants and the medical technologist were all employees of the same entity—Rex Hospital; therefore, the medical technologist could not be an employee of the defendant doctors. Here, defendants are employed by the East Carolina University ("ECU") School of Medicine as members of the faculty, and the resident physicians are employees of the Hospital.

"[W]here the parties have made an explicit agreement regarding the right of control, this agreement will be dispositive." *Harris*, 335 N.C. at 387, 438 S.E.2d at 735 (citing *Producers Chemical Co. v. McKay*, 366 S.W.2d 220, 226 (Tex. 1963) ("When a contract, written or oral, between two employers expressly provides that one or the other shall have right of control, solution of the [borrowed servant] question is relatively simple."). The forecast of evidence in this case shows that the ECU School of Medicine and the Hospital entered into an "Agreement of Affiliation" whereby the Hospital delegated its responsibility to supervise and control the resident physicians' performance of duties to the ECU School of Medicine's dean and faculty members. Defendants MacKenna and Borchert were employed by the ECU School of Medicine as members of the faculty and were not employees of the Hospital. Paragraph C of the agreement provides that "medical students and house staff shall be responsibly involved in patient care under the supervision of the Dean and the faculty of the School of Medicine." The Hospital's rules and regulations specify that "a patient may be admitted to the hospital only by a member of the medical staff." The Hospital's trustee bylaws provide that "[o]nly a licensed physician with clinical privileges shall be directly responsible for a patient's diagnosis and treatment." Paragraph H of the Hospital's medical bylaws provides that "the house staff officer will only practice under the direction of the department chairman or his delegate. Each chairman is finally responsible for the action of the house staff officers in his department." The medical bylaws also provide that only physicians who are Board-certified or Board-eligible— those who have completed their residency—by the American Board of Obstetrics and Gynecology are eligible for clinical privileges.

As we have previously stated, in this case, because plaintiff Rouse was an indigent patient, she was admitted to the service of defendant MacKenna. Defendants MacKenna and Borchert hold unlimited licenses to practice medicine and are Board-certified and, therefore, had been granted clinical privileges at the Hospital; the resident physicians were not eligible for clinical privileges. In addition, Dr. Borchert gave a description of his understanding of what supervision of the resident physicians entailed:

> Supervision can vary depending upon again the extended training of the residents. At times, I think supervision can be actually doing a task in the form of teaching. That's also supervision. I think supervision could be holding someone's hand while they do something. I think supervision could be observing them while they do something and commenting about their performance. I think supervision could say please don't do that; let me do that. I think supervision could be a combination of all these things, but basically I think supervision involves being able to respond when called on to help. Supervision involves being certain that the patient is being cared for well.

Finally, plaintiff's experts averred in their affidavits that the resident physicians worked "under the supervision of, and *at the pleasure of*, the attending physician who is responsible for the medical care delivered to the patient." (Emphasis added.)

While there is evidence in the record that the Hospital retained the authority to hire, pay, discipline, and terminate the resident physicians and the ultimate authority to grant hospital privileges to residents to perform certain tasks (i.e, emergency cesarean sections by fourth-year resident physicians), there is also evidence that tends to show that the Hospital delegated the right to control the resident physicians' *manner* of performance related to the provision of medical services to patients exclusively to the ECU School of Medicine's department chairperson or his delegates (i.e., ECU faculty attending physicians who had been granted clinical privileges at the Hospital), thereby allowing the resident physicians' negligence to be imputed to the attending physicians. This conclusion is further supported by the fact that the Hospital did not employ an obstetrician and thus presumably did not itself have the means of controlling obstetrical decisions. *See Harris*, 335 N.C. at 397, 438 S.E.2d at 741. Therefore, based on the foregoing, we must conclude that plaintiff's forecast of the evidence is sufficient to raise a genuine issue of material fact as to whether defendants MacKenna and Borchert had the right to control

the resident physicians' performance of their duties. We hold that the trial court improperly entered summary judgment for defendants on the claims of the negligent supervision and vicarious liability based on the "borrowed servant" doctrine. The decision of the Court of Appeals is

AFFIRMED.

Justice PARKER did not participate in the consideration or decision of this case.